IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


RANDALL A. SCHNEIDER
and AMY L. SCHNEIDER

                    Plaintiffs,

          v.                                              No. 13-4094-SAC

CITIMORTGAGE, INC.,
et. al.,

                    Defendants.


MEMORANDUM AND ORDER

          Finding its repeated admonitions for adherence to the letter and

spirit of Fed. R. Civ. P. 1 ignored, the court again is inundated with filings

whose number and length are excessive, redundant, and unnecessary.

These filings plainly reflect the negative aspects of the parties' and counsels'

overly litigious and contentious behavior throughout this suit's history. The

court's time and effort expended on this case has greatly exceeded what

should have been expected from this litigation if the spirit of Rule 1 had

governed the communication, cooperation and conduct of all involved. The

other significant drain upon the court's resources has been the plaintiffs'

failure to present their claims and arguments consistently, clearly and

concisely. Contentious behavior and inferior presentations are an

aggravating combination.

For the sake of efficiency and expedition, the court will limit its order to discussing only the most central facts and to ruling only on those legal issues and arguments controlling in its judgment. The parties rightly should assume that the factual issues and legal contentions not appearing in this order were still considered and researched but were found to be non-essential in resolving the summary judgment motions. The court sets out the following factual context to serve as a simple background for its rulings, and it reserves fuller discussion of the more specific and essential facts when it addresses the pending motions in the order in which they were filed.

**SUMMARY JUDGMENT STANDARDS**

Ultimately, a court grants summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see* Fed. R. Civ. P. 56. But first, the movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. This does not mean the moving party must negate the other side's claims or defenses through affidavits. *Id.* Upon a properly supported motion for summary judgment, the nonmoving party must go

beyond the pleadings, that is, mere allegations or denials, and set forth specific facts showing a genuine issue of material fact for trial, relying upon the types of evidentiary materials contemplated by Rule 56. *Id*.

A court decides the motion "through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). So, a factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Id*. at 248. To be genuine, a factual dispute requires more than a mere scintilla of evidence in support of a party's position. *Id*. at 252. This means that the purpose of Rule 56 "is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). At the same time, the summary judgment stage does not authorize the court's weighing of the evidence, crediting some over other, or determining the truth of disputed matters, but it shall decide whether a genuine issue of material fact for trial exists. *Tolan v. Cotton*, ––– U.S. ––––, 134 S.Ct. 1861, 1866, (2014). The court performs this task with a view of the evidence that favors most the party opposing summary judgment. *Id*. Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. *Liberty Lobby*, 477 U.S. at 250–51. Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require

submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505.

**FACTUAL BACKGROUND**

The plaintiffs' residence in Nortonville, Kansas, was subject to a residential mortgage loan they had with the lender Citicorp Trust Bank, f.s.b. a/k/a Citibank, N.A. ("Citibank"). They refinanced their loan with Citibank on September 17, 2007, with the plaintiffs executing a promissory note for $107,996.88 for a term of 10 years and executing a mortgage that granted Citibank a first-priority lien and security interest in the Nortonville residence. Both the note and the mortgage defined Citibank as the "Lender." (Pretrial Order ECF# 519, Stip. 1-6). The mortgage conveyed a lien to Citibank and the recorded mortgagee was Citibank.

During the relevant time that the plaintiff's mortgage loan existed, Citicorp was a federal savings bank regulated by the federal Office of Thrift Supervision. Citicorp's business included originating home mortgage loans for Kansas borrowers. A merger in January of 2012 resulted in Citicorp Trust Bank being known as Citibank, and it is regulated by the federal Office of the Comptroller of the Currency.

Included as voluntary features to the plaintiffs' refinanced loan was a Payment Waiver Protection Program ("Payment Waiver Program" or "PWP") and an Equity Builder Interest Rate Discount Program ("Equity Builder Program" or "EBP"). The PWP covered only Randall Schneider and

4

provided for the payment of scheduled mortgage payments if he became disabled or involuntarily unemployed. At the closing on September 17, 2007, the plaintiffs received a document entitled, "Addendum to Note Payment Waiver Protection Program" and signed the same that day. *Id*. Stips. 10 and 11. Approximately six months later, Amy Schneider timely submitted PWP documents for Randall Schneider's disability. The PWP "ultimately addressed plaintiffs' responsibility to make mortgage payments from April 2008 through March 21, 2010." *Id*. Stip. 12.

Citibank serviced the plaintiffs' loan after origination, but CitiMortage began servicing the loan on or after June 11, 2008. Servicing the "loan included collection of payments, administration of features of the loan, communicating with plaintiffs, processing payments, calculating payments, creating payoff statements on the loan." *Id*. Stip. 17. Citibank's letter to the plaintiffs explained that this change of servicer would "not affect the terms and conditions of your loan documents." ECF# 524-19, p. 1.

**CLAIMS**

As summarized in the pretrial order, the plaintiffs withdrew their counts under the Equal Credit Opportunity Act and the Real Estate Settlement Procedures Act, and the court already dismissed the plaintiffs' counts for conversion, fraud, and breach of contract events occurring before May 24, 2008. Broadly stated, the plaintiffs' remaining claims are either for breaches of the implied covenant of good faith and fair dealing and/or the

express contracts, **or** for violations of unconscionable and deceptive practices according to the Kansas Consumer Protection Act, K.S.A. 50-623 *et seq.* ("KCPA"). ECF# 519, pp. 15-16.

As set out in the pretrial order, the plaintiffs allege a number of breaches related to the 2007 contractual agreements contained in their promissory note, mortgage, Payment Waiver Protection Program ("PWP"), the Equity Builder Interest Rate Discount, the Equity Builder bi-weekly program, and the $.M.A.R.T. loan plan. The conduct alleged to be in breach of these agreements includes: interest rates being increased and overcharged, payments not being properly credited, fees being posted, unearned fees (including PWP fees) being assessed and collected, benefits of PWP not being fully provided, late charges being assessed when not owed or when PWP was covering loan payments, and pre-payment penalty being imposed. ECF# 519, p. 16-18.

As set out in the pretrial order, the plaintiffs allege the following legal theories for the 2010 attempted refinance. ECF# 519, pp. 14-15, 18-20. They worked with Kerry Cobb of Primerica in applying to refinance their loan with Citibank. They allege that Primerica and Citibank concealed their eligibility for refinancing, did not offer them alternative financing programs for which they were eligible, and denied their refinancing application. The plaintiffs allege that Primerica contracted with them in a mortgage broker

agreement and disclosure that revealed Primerica's exclusive relationship with the Citi defendants.

In their summary judgment filings, the plaintiffs purport to bring contractual and KCPA claims based on the defendants' using interest rates that allegedly exceeded Kansas Usury laws. The defendants contend the plaintiffs may not bring such claims now. While Kansas recognizes an action for usury, the defendants argue that the plaintiffs failed to allege this claim in their complaint and that the plaintiffs' recent efforts to add such a claim were denied at the pretrial conference. ECF# 519, p. 38. The defendants ask the court to keep the plaintiffs from making "an end-run" through recasting their untimely usury claims into another alleged breach of contract or violation of the KCPA. The court sustains the defendants' objection. The plaintiffs have not timely pleaded their usury claims and will not be allowed to evade the consequences through new theories for contractual breaches or KCPA violations. Indeed, the plaintiffs' usury theory is not properly articulated and disclosed in the pretrial order as part of their remaining claims. The pretrial order does not preserve a claim for usury law violations constituting a breach of the implied covenant of good faith and fair dealing. ECF# 531, p. 18 n. 2. The pretrial order supersedes all pleadings and controls the subsequent course of the case. Fed. R. Civ. P. 16(d); D. Kan. Rule 16.2(b). The "pretrial order measures the dimensions of the lawsuit," and at the final pretrial conference attorneys "must make a full and fair

disclosure of their views as to what the real issues of the trial will be."

*Youren v. Tintic School Dist.*, 343 F.3d 1296, 1304 (10th Cir. 2003) (internal

quotation marks and citations omitted). If an issue is omitted from the

pretrial order, then it is not part of the case. *Id*. Thus, the court finds that

the plaintiffs do not have a breach of implied covenant/contract claim or

KCPA claim based on the issue or theory that the interest rates violated

state usury laws.

**SUMMARY JUDGMENT MOTION OF CITIMORTGAGE, INC. AND CITIBANK, N.A. ECF #523**

<u>KCPA</u>

The defendants open their motion arguing that the plaintiffs are

unable to prove a KCPA claim because Citibank is not a "supplier" under the

KCPA's express terms. There is no question that to prevail on their KCPA

claims, the plaintiffs must be able to prove that the defendants are suppliers

under the KCPA. *In re Motor Fuel Temperature Sales Practices*, 279 F.R.D.

598, 604 (D. Kan. 2012); *Alexander v. Certified Master Builders Corp.*, 268

Kan. 812, 825-26, 1 P.3d 899 (2000); *Farrell v. General Motors Corp.*, 249

Kan. 231, 242, 815 P.2d 538 (1991); K.S.A. 50-524(l)(definition of

"supplier"; K.S.A. 50-626(a) ("No supplier shall engage in any deceptive act

or practice in connection with a consumer transaction."); K.S.A. 50-627(a)

("No supplier shall engage in any unconscionable act or practice in

connection with a consumer transaction."). To make their argument, the

defendants rely on the plain terms of KCPA's own controlling definition of "supplier":

> (l) "Supplier" means a manufacturer, distributor, dealer, seller, lessor, assignor, or other person who, in the ordinary course of business, solicits, engages in or enforces consumer transactions, whether or not dealing directly with the consumer. Supplier does not include any bank, trust company or lending institution which is subject to state or federal regulation with regard to disposition of repossessed collateral by such bank, trust company or lending institution.

K.S.A. 50-624(l). The uncontroverted facts are that Citicorp and Citibank were subject to federal regulation during the relevant time periods.

The plaintiffs respond that, "Defendants ignore the canons of statutory construction and clear legislative history in favor of overreaching to ignore the limits of the 2005 amendment, ignore the amendment in 2009, then again ignore the amendment in 2010; all of which settle the applicability of the KCPA to these Defendants." ECF# 557, p. 22. The plaintiffs' summary of Kansas statutory construction law stops at, "The interpretation of a statute is a question of law, and it is the function of the court to interpret a statute to give it the effect intended by the legislature." *Finstad v. Washburn University*, 252 Kan. 465, 471, 845 P.2d 685 (1993) (citation omitted). The plaintiffs want this rule to mean that all avenues for discerning legislative intent are immediately and unconditionally available for consideration. This is not, however, the law in Kansas. In *Finstad*, more than the language used in the statute was considered, because the Court was being asked to interpret "aggrieved" which was not defined in the KCPA and

its meaning was in dispute. 252 Kan. at 469-472. Unlike the situation in *Finstad*, the KCPA clearly and unambiguously defines "supplier."

"When a statute is clear and unambiguous, appellate courts give effect to legislative intent expressed through the words of the statute, rather than make a determination of what the law should or should not be." *Carlson Auction Service, Inc. v. Kansas Corporation Commission*, 55 Kan. App. 2d. 345, 349, 413 P.3d 448, 451 (Kan. App. 2018) (citing *Ullery v. Othick*, 304 Kan. 405, 409, 372 P.3d 1135 (2016)). Thus, if the statutory term in issue is clear and unambiguous, a court will not "use canons of construction or legislative history or other background considerations to construe the legislature's intent." *Ullery*, 304 Kan. at 409. The plaintiffs come forward with no reasonable argument for finding ambiguity with the KCPA's definition of "supplier" that expressly excludes a regulated bank, trust company or lending institution. Absent this showing, a court may not resort either to other canons of statutory construction, such as in pari materia, or to legislative history as to arrive at a legislative intent different from that plainly expressed in this statutory definition.

The court is not alone in its reading and application of KCPA's express exclusion of regulated banks. *See, e.g., Kalebaugh v. Cohen, McNeile & Pappas, P.C.*, 76 F.Supp.3d 1251, 1260 (D. Kan. 2015)(J. Marten) ("Discover Bank is not a supplier under the KCPA if it is subject to state or federal regulation.")(citing *Kastner v. Intrust Bank*, 2011 WL 721483, at *3

n.3 (D. Kan. Feb. 22, 2011)(M.J. Humphries) ("K.S.A. § 50–624(l) appears to exclude banks and lending institutions that are subject to state and federal regulation from the definition of 'supplier' and the court assumes that defendant Intrust Bank satisfies this exception.")); *Briscoe v. Cohen, McNeile & Pappas, P.C.*, 2014 WL 4954600, at *11 (D. Kan. Oct. 1, 2014)(J. Crabtree) ("the Bank is not a supplier under the KCPA if it is subject to state or federal regulation.")); *Ellis v. Chase Bank USA, NA,* 2017 WL 5158311, at *3 (D. Kan. Nov. 7, 2017)(J. Crabtree) ("The KCPA specifically excludes state and federally regulated banks from the definition of 'supplier.'"); *In re Larkin*, 553 B.R. 428, 443-445 (Bankr. D. Kan. 2016)("Adopting the Larkins' interpretation would effectively rewrite the "regulated bank" exclusion in the definition of 'supplier.' That is a task for the Kansas legislature, not me." (footnote omitted)); *White v. Security State Bank*, 2017 WL 5507943, at *8, 405 P.3d 1241 (Table) (Unpub. Op.) (Kan. App. Nov. 17, 2017) ("We are persuaded that the plain, common sense reading of the exclusionary language of K.S.A. 2016 Supp. 50-624(l), as discussed in *Larkin* and *Kalebaugh* is the proper approach to understanding the legislature's meaning in drafting this particular statutory provision.").

Most of the plaintiffs' arguments for interpreting "supplier" ask the court to look elsewhere for legislative intent than the plain terms of the express exclusion in K.S.A. § 50-624(l). They would have the court assume the Kansas legislature intended to do something other than what it plainly

said. They would have the court rewrite the express exclusion, give it a narrower meaning, and justify that meaning by employing the different canons of statutory construction and by divining legislative intent from prior and subsequent legislative enactments. The plaintiff's approach contravenes Kansas law, "When a statute is plain and unambiguous, an appellate court does not speculate as to the legislative intent behind it and will not read into the statute something not readily found in it." *Ullery v. Othick*, 304 Kan. at 409.

The plaintiffs fail to justify looking outside the statutory language in determining legislative intent here. The Kansas Supreme Court in *Finstad* did not create a unique rule of statutory construction for KCPA cases. Instead, it simply followed the fundamental rules of statutory construction for determining the meaning of an undefined and ambiguous term. 252 Kan. at 471-72.

The plaintiff argues this court should reject the string of case law interpreting the KCPA's definition of "supplier," because those courts did not consider legislative history. The plaintiffs are wrong on two points. First, legislative history was referenced by those courts. More importantly, those courts rejected reading a legislative intent into the definition that was different from the legislature's plain and unambiguous language. The plaintiffs correctly observe that the cited case law is not controlling upon this court's decision. Nonetheless, this does not mean that the case law is

without persuasive weight in understanding and applying a statutory

definition that is plain on its face.

Indeed, none of the plaintiffs' arguments convince this court that

Judge Marten, Judge Nugent or Judge Crabtree were wrong in sticking with

the statute's plain terms and in rejecting the same narrow interpretation

that the plaintiffs are wanting here. Judge Marten in *Kalebaugh* said:

> Plaintiff disagrees with this interpretation of the definition of "supplier" and instead argues that the KCPA only excludes banks, trust companies, and lending institutions when the issue at hand is the "disposition of repossessed collateral." Ergo, since the issue before the court deals only with the alleged outstanding balance on a credit card and not the disposition of repossessed collateral, Discover Bank is a supplier under the KCPA. The court disagrees. Plaintiff offers absolutely no support, statutory or otherwise, for this distinction. Nor did the court find, during its own review of the law, any such support for this interpretation. Furthermore, the court cannot extrapolate this meaning from the plain language of the statute. The court therefore concludes that Discover Bank is not a supplier under the KCPA if it is subject to state or federal regulation.

76 F.Supp.3d at 1260. Judge Nugent in *Larkin* concluded

> I concur with Judge Marten's analysis. Wittingly or not, the Legislature has created a sizable hole in the KCPA through which banks like BOA can slip, regardless of their conduct. While the "guiding principle" of the KCPA is to protect consumers from suppliers who commit deceptive and unconscionable acts, a goal that requires liberal construction, that only goes as far as the words that are contained in the statute. I cannot interpret words that aren't there or replace them with others. Adopting the Larkins' interpretation, would effectively rewrite the "regulated bank" exclusion in the definition of "supplier." That is a task for the Kansas Legislature, not me.

553 B.R. at 444-45. In a footnote, Judge Nugent cogently observed that if

the Kansas Legislature had intended only to carve out a transaction involving

repossessed collateral then it should have altered the definition of "consumer

transaction" instead of doing what it did and excluded an entire entity from the definition of "supplier." *Id.* at 445, n. 79. Most recently, Judge Crabtree was persuaded to follow these cases and not the legislative history arguments that were advanced:

> Plaintiff asserts that the statute's legislative history supports a narrower construction of the KCPA, applying only to suppliers engaging in transactions "relating to the occasional sales of certain repossessed collateral." Doc. 10 at 2. But, our court has rejected this very argument. *See Kalebaugh v. Cohen, McNeile & Pappas, P.C.*, 76 F.Supp.3d 1251, 1260 (D. Kan. 2015)(rejecting a plaintiff's argument "that the KCPA only excludes banks, trust companies, and lending institutions when the issue at hand is the 'disposition of repossessed collateral'" because the court found 'no support, statutory or otherwise for this distinction" and also could not "extrapolate this meaning from the plain language of the statute"). More recently, the Bankruptcy Court for Kansas has concluded that the unambiguous statutory language in the KCPA specifically excludes from the KCPA's definition of "supplier" any bank that is subject to state or federal regulation. *Larkin*, 553 B.R. at 444. In doing so, Judge Nugent expressly rejected plaintiff's argument that "disposition of repossessed collateral" is a prerequisite to conclude that a federal or state regulated bank is excluded from the scope of the term "supplier" under KCPA. *Id.*
> Following the previous decisions by our court and the bankruptcy court, the court concludes here that the language of the statute is plain and unambiguous. The KCPA specifically excludes state and federally regulated banks from the definition "supplier." As explained above, defendant is subject to federal regulation under the OCC. Defendant thus is a federally-regulated bank, and it is not a "supplier" under the KCPA.

*Ellis*, 2017 WL 5158311 at *3. Judge Crabtree also rejected the plaintiff's argument that the Kansas state courts would treat banks as suppliers and distinguished the plaintiff's citations. *Id.* Ten days after Judge Crabtree's decision, the Kansas Court of Appeals in an unpublished decision

distinguished other state court decisions and followed the plain wording of

"supplier":

> A plain reading of the statutory language persuades us that the interpretation proposed by the Whites is too narrow. The basic text of the supplier exclusion does not limit its application to only those times when the bank is actively disposing of repossessed collateral. Rather based on the plain language, if a bank is generally subject to regulations pertaining to disposition of repossessed collateral, the bank is excluded as a supplier under the nomenclature and reach of the KCPA.
> . . . .
> We are persuaded that the plain, common sense reading of the exclusionary language of K.S.A. 2016 Supp. 50-624(l), as discussed in *Larkin* and *Kalebaugh*, is the proper approach to understanding the legislature's meaning in drafting this particular statutory provision. Because  concluded, as a matter of law, that the Bank was not a supplier for purposes of the KCPA, we find no error in the district court's dismissal of this claim.

*White v. Security State Bank,* 2017 WL 5507943, at *7-*8, 405 P.3d 1241

(Table) (Unpub. Op.) (Kan. App. Nov. 17, 2017). The court summarily

rejects the plaintiffs' argument that an ambiguity must exist because these

courts are reading the exclusion contrary to the plaintiffs' understanding of

legislative intent. This is not only a circular argument, but it defies Kansas

law on statutory construction summarized above.

The court disagrees with the plaintiffs' position that these three

federal court decisions and one state court decision are no more than

piggyback rulings. Instead, the portions quoted above show that in each

instance the court reviewed the statute, arguments and case law and was

persuaded to reach its own conclusion that the statute was unambiguous

and followed the prior decisions correctly applying Kansas statutory

construction law. The court places no stock in plaintiff's inflammatory caricature of this precedent as, "the recent trend in big bank firms persuading the Court to rule to provide an exception which was never intended by the legislature." ECF# 557, p. 27.

So that the record is complete on this issue, the court quickly addresses some of the plaintiffs' other arguments. Subsequent amendments to other provisions in the KCPA, provisions within the Kansas Mortgage Business Act, and the legislative summaries of subsequent amendments are not viable doors for speculating about legislative intent when the supplier exclusion is plain and unambiguous. That the exclusion constitutes only one sentence matters little when it serves the controlling function of defining a central term of the Act. The court's interpretation of this exclusion does not implicate or involve any concerns over preemption. As stated above, the plaintiffs have the burden to prove that the defendants were suppliers under the KCPA, and summary judgment is proper against the party who does not make a sufficient showing on an essential element to its case on which it bears the burden of proof at trial.

*CitiMortgage*

Effective July 1, 2008, CitiMortgage began servicing the plaintiff's mortgage loan account with Citibank. ECF# 524-19, p. 1. The letter of notice disclosed that this only was a transfer of servicing rights and not debt:

> You are hereby notified that the servicing of your mortgage loan, that is, the right to collect payments from you, is being assigned, sold or transferred from Citicorp Trust Bank, fsb to CitiMortgage, Inc. effective July 1, 2008.
>
> The assignment, sale, or transfer of the servicing of your mortgage does not affect any terms or conditions of the mortgage instruments, other than the terms directly related to the servicing of you loan.
>
> . . . .
>
> Citicorp Trust Bank, fsb originated loans are serviced by CitiMortgage, Inc.

ECF# 524-19, p. 2. CitiMortgage and Citicorp Trust Bank were subsidiaries of Citigroup from 2007 through 2010. Being under Citigroup's common control and with CitiMortgage taking over the servicing of Citicorp Trust Bank's originated loans, the two would qualify as affiliates under the common meaning of that term. *See Cray v. Kennedy*, 230 Kan. 663, 672, 640 P.2d 1219 (1982) (looked at conditions of being connected and attached as members with an element of dependability on one another); *Black's Law Dictionary*, AFFILIATE (10th ed. 2014) ("A corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation.").

The defendant CitiMortgage argues it too comes within the KCPA's regulated bank exclusion as an affiliate of Citicorp Trust Bank. As plainly defined, the KCPA exclusion encompasses "*any* bank, trust company or lending institution." K.S.A. 50-624(l). In this same "definitions" section of the KCPA, the term, "Lender" is defined as "a bank, savings and loan association, savings bank, credit union, financial company, mortgage bank,

mortgage broker and *any* affiliate." K.S.A. 50-624(f). Even though the courts have not directly addressed the application of "affiliate" to the regulated bank exclusion, the defendant notes the bankruptcy court in *Larkin* recognized and discussed the defendant bank in the singular even though the loan was serviced for a period by another entity which later merged with the defendant.

The plaintiffs respond that the defendants effectively admit they are covered by the KCPA by any one of them claiming to be a "lender" and affiliate. The plaintiffs note that "affiliate" appears nowhere within the regulated bank exclusion and that adding "affiliate" would expand the exclusion beyond its express wording. Finally, the plaintiffs contend CitiMortgage was not regulated nor licensed under the Kansas Mortgage Business Act as required by K.S.A. 50-626(13)(C) and speculate that CitiMortgage may have been the lender because some loan-related information reached it for processing.

The plain terms of the bank exclusion extend to "any . . . lending institution . . . ." K.S.A. 60-524(l). There is nothing in the KCPA nor in the parties' presentations that offers a rational basis for meaningfully distinguishing between a "lending institution" and a "lender" in this case. The latter may emphasize an entity's role in a transaction or relationship while the former may more generally describe the entity's nature. With that said, an entity like Citicorp/Citibank is a lending institution which served its role as

a lender in the subject transaction. Thus, Citibank is subject to both terms, and the definitions should be read together and in consonance with each other. The absence of "affiliate" in the banking exclusion is of no moment when the definition of "lender" plainly shows an intent to encompass all affiliated entities within the meaning of "lender" and thereby, "lending institution." The parties' stipulations and the controlling legal documents establish as a matter of law that Citibank was the lending institution and lender for purposes of this transaction. From the uncontroverted facts, the court concludes that CitiMortgage comes within the KCPA's regulated bank exclusion because it was an affiliate of Citicorp/Citibank during the relevant time.

The plaintiffs' last effort at avoiding this exclusion is to say this court has "already ruled" this was a "consumer transaction" under the KCPA. ECF# 557, p. 32. What the court decided was the defendants' contentions over the meaning of "consumer transaction," not "supplier." ECF# 20 at pp. 18-22. That ruling remains the law of the case over the meaning of a "consumer transaction" and its application here. It, however, did not address and was not a ruling on the applicability of the regulated bank exclusion found in the KCPA's definition of "supplier." The defendants' summary judgment argument is not as the plaintiffs suggest a "re-run" of what the court has already rejected. ECF# 557, p. 33. Instead, the defendants' arguments for applying the regulated bank exclusion are not only new to the

case but decisive of the plaintiffs' KCPA claims. The defendant movants are entitled to summary judgment on the plaintiff's KCPA claims.

The defendants alternatively argue for summary judgment on certain KCPA claims as untimely, on claims of unconscionable conduct as lacking evidence and subject to judicial determination, and on claims for deceptive conduct as lacking evidence on willfulness, a duty to speak, and actionable misrepresentations. Because neither defendant is a "supplier" under the KCPA, the court will not address these additional contentions.

<u>BREACH OF CONTRACT</u>

*Choice of Law*

As set forth in the pretrial order, the defendants Citibank and CitiMortgage contend that Delaware law governs the plaintiffs' breach of implied and express contract claims concerning events occurring on or after May 24, 2008, and relating to alleged loan servicing errors. The defendants contend the promissory note governs the plaintiff's repayment of the debt being serviced and that the note contains a choice of law provision. On September 17, 2007, the Schneiders signed not only the promissory note but also a "Governing Law/Prepayment Penalty Addendum to Note." ECF #524-2. Under section one entitled, "Governing Law," the addendum reads:

> This Note will be governed by the United States federal law and, to the extent United States federal law is inapplicable, then by the laws of the State of Delaware; except that, with regard to the perfection and enforcement of Lender's security interest in the Property, the Notice and Security Instrument will be governed by the laws of the site where the Property is located.

ECF# 524-2, p. 5. The addendum expressly states in its opening sentence that it is to be "incorporated into and . . . be deemed to amend and supplement the Note made by the undersigned ('Borrower'), in favor of Citicorp Trust Bank, fsb ('Lender') . . . ." *Id.*

When exercising diversity jurisdiction, this court applies the choice-of-law rules of the state in which it sits, *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941), and this includes that forum's rules applicable in deciding whether the "contractual choice-of-law provision is enforceable." *Equifax Services, Inc. v. Hitz*, 905 F.2d 1355, 1360 (10th Cir. 1990). "Where the parties to a contract have entered an agreement that incorporates a choice of law provision, Kansas courts generally effectuate the law chosen by the parties to control the agreement." *Brenner v. Oppenheimer & Co. Inc.*, 273 Kan. 525, 539, 44 P.3d 364 (2002). This general rule is subject to the "well-recognized exception" of when "the application of the contracting parties' choice of law provision engenders a result contrary to public policy." *Id.* at 540. In short, "[i]f a choice of law provision is contrary to the public policy of the forum state, it will not be enforced by the court," and the law of the forum will apply. *Id.* at 541.

The plaintiffs refer to the public policy exception without offering any arguments persuasively establishing the exception. The plaintiffs were given and signed an addendum that expressly recognized the governing law for the promissory note as federal law and then Delaware law when federal

21

law was inapplicable. The defendants point out that federal law is inapplicable to the plaintiffs' claims regarding the servicing of the note, that Delaware law is largely consistent with Kansas law, and that any differences fail to justify a public policy exception. The plaintiffs fail to address the defendants' points. The court agrees with the defendants' position based on the arguments presented in the parties' briefs and will look to Delaware law in resolving the breach of contract claims. When important, the court will take note of parallels to Kansas law for its ruling.

*2007 Implied Contract*

Concerning the 2007 note, the plaintiffs factually contend in the pretrial order that based on representations by Kerry Cobb they had planned to pay off the loan in 7.5 years by building equity and protecting against a disability with the PWP program. This is what the plaintiffs generally expected as the benefits flowing from their participation in certain special programs available with their loan. While they assert this general expectancy of benefits, they do not connect any specific benefits to any express terms in their written agreements. The plaintiffs rely on this general expectancy of benefits in bringing their breach of an implied duty of good faith and fair dealing claim laid out in the pretrial order:

> The manner in which the Defendants undertook the servicing and administration of the loan deprived the Schneiders of the expectancy set forth by Kerry Cobb and Defendants where rather than building equity on an accelerated basis, the Schneiders who were always on autopay, until cancelled immediately before the refinance with US Bank, or covered by the PWP protection, and added thousands in extra

principal payments ended up going backwards as if they were multiple payments behind and not getting credit for the time the balance was lower by using reversals. Not only were the payments continually misapplied, but unbeknown to the Schneiders, CitiMortgage didn't even have the ability to properly service a bi-weekly loan and had accepted the Schneiders loan and all other Primerica similar originations continuing to mount pecuniary damages on the backs of the borrowers to their foreseeable benefit.

ECF# 519, p. 17. The pretrial order also asserts a breach of an implied contract claim for collecting PWP premium payments after the plaintiffs exhausted their benefits and eligibility under the PWP. *Id.* at p. 18.

The defendants seek summary judgment on this implied duty claim arguing that Delaware law precludes using or recognizing any implied term that essentially adds new terms or overrides express terms. *See In re IT Group, Inc.*, 448 F.3d 661, 671 (3rd Cir. 2006) ("the implied duty of good faith is merely an interpretive tool to determine the parties' justifiable expectations, . . .; it may not be used to add new terms to an agreement, . . . , or to override express contractual terms, . . . ." (internal quotation marks and citations omitted)). The Tenth Circuit has summarized Delaware law in this way:

"Under Delaware law, an implied covenant of good faith and fair dealing inheres in every contract." *Chamison v. Healthtrust, Inc.*, 735 A.2d 912, 920 (Del.Ch.1999). "As such, a party to a contract has made an implied covenant to interpret and to act reasonably upon contractual language that is on its face reasonable." Id. "This implied covenant is a judicial convention designed to protect the spirit of an agreement when, without violating an express term of the agreement, one side uses oppressive or underhanded tactics to deny the other side the fruits of the parties' bargain." *Id.* "It requires the [finder of fact] to extrapolate the spirit of the agreement from its express terms and based on that 'spirit,' determine the terms that the parties would have

bargained for to govern the dispute had they foreseen the circumstances under which their dispute arose." *Id*. at 920–21. The "extrapolated term" is then "implie[d] … into the express agreement as an implied covenant," and its breach is treated "as a breach of the contract." *Id*. "The implied covenant cannot contravene the parties' express agreement and cannot be used to forge a new agreement beyond the scope of the written contract." *Id*.

*O'Tool v. Genmar Holdings, Inc.*, 387 F.3d 1188, 1195 (10th Cir. 2004).

Kansas law essentially coincides with Delaware law:

This implied duty is derivative in nature, meaning that it does not create new contract terms but grows out of existing ones. The duty of good faith and fair dealing only amplifies duties and rights already existing under the terms of the agreement. The goal of the implied duty is to accomplish the parties' express promises, so a breach is actionable when it relates to an aspect of performance under the terms of the contract. Accordingly, the Defendants must point to a term in the contract that Cargill has violated by failing to abide by the good faith spirit of that term.

*Cargill Meat Solutions Corp. v. Premium Beef Feeders, LLC*, 168 F. Supp. 3d 1334, 1345 (D. Kan. 2016) (footnotes omitted); *see Bonanza, Inc. v. McLean*, 242 Kan. 209, 222, 747 P.2d 792, 801 (1987) ("[C]ontracts impose on the parties thereto a duty to do everything to accomplish the result intended by the parties." and "[E]ssential terms of a contract on which the minds of the parties have not met cannot be supplied by the implication of good faith and fair dealing.").

Specifically, the defendants seek summary judgment on this implied contract claim because there is no evidence that Kerry Cobb spoke on their behalf about the servicing of the 2007 note and because the note, addendum and mortgage expressly addressed payments and administration

of the same and left nothing to implication. Thus, "alleged accounting errors by Citibank/CitiMortgage cannot be the subject of a claim for breach of an implied covenant." ECF# 524, p. 37.  Alternatively, the defendants argue that Delaware law does not permit recovery for breach of an implied duty absent a special relationship existing between the parties, and the plaintiffs have no proof of such a relationship here which was like any debtor/creditor relationship, that is, marked by an arms-length transaction and adversarial terms. The defendants find support in the plaintiffs' demand letter of May 26, 2011, which did not refer to or hint at any special relationship but rather spoke out of concern for all Kansas consumers in real estate mortgage markets. The defendants note that Kansas law regards the borrower/lender relationship as having "an adversarial character" and as not being a "special relationship" justifying the imposition of extra duties. *Jack v. City of Wichita*, 23 Kan. App. 2d 606, 614, 933 P.2d 787 (1997) (citing *Bank IV Wichita, Nat. Ass'n v. Arn, Mullins, Unruh, Kuhn & Wilson*, 250 Kan. 490, 505, 827 P.2d 758 (1992), and *Nelson v. Millier*, 227 Kan. 271, 287, 607 P.2d 438 (1980)).

The plaintiffs' memorandum opposing summary judgment (ECF# 557) does not respond to any of the defendants' arguments summarized in the prior paragraph. When a party at the summary judgment stage fails to respond in defense of a claim, courts typically conclude that plaintiffs are abandoning a claim based on that failure. *See C.T. v. Liberal Sch. Dist.*, 562

F.Supp.2d 1324, 1337 (D. Kan. 2008) See *Hinsdale v. City of Liberal, Kan.*, 19 Fed. Appx. 749, 2001 WL 980781, at *16–17 (10th Cir. 2001) (affirming district court's conclusion that plaintiff had abandoned a claim when he failed to address it in the memorandum opposing summary judgment and concluding the failure to address was "fatal" to the claims. (citing *Coffey v. Healthtrust, Inc.*, 955 F.2d 1388, 1393 (10th Cir. 1992)). This conclusion would not be reasonable here, because the plaintiffs have filed their own motion for partial summary judgment on their implied duty of good faith and fair dealing claim regarding the 2007 loan. ECF## 530 and 531. The plaintiffs specifically argue:

> In this case, the Defendants engaged in increasing rates over the highest possible fixed interest rate to cover the contract, applied payments late and sometimes not at all, engaged in confusing recalculations which skimmed unearned interest, applied direct principal payments intended to reduce the balance of the loan into their own pockets rather than the Schneider's home equity which was negatively impacted when the entire purpose of the of the contract was the opposite; to build equity and save interest. As such, the Defendants by each act and the totality of the acts breached duty of good faith and fair dealings owed to the Schneiders.

ECF# 531 p. 17. And in their reply brief, the plaintiffs summarily contend:

> **GOOD FAITH AND FAIR DEALING**
> Defendants again try to escape Kansas law arguing Delaware has no such requirement. Defendants assert how payments were applied is an implied term. In fact, payment application and order is a matter of express contract and federal law. However, it can also be so violative of the express written contract that it rises to a breach of good faith and fair dealing as here. Defendants argue again ignoring Plaintiffs brief which does not meet their burden to respond.

ECF# 567, p. 26. While abandonment is not a fair inference from these circumstances, the court is still left with the uncontested arguments in the defendants' motion. These arguments plainly challenge the merits of the plaintiff's implied contract claim. The court is unable to construe or lift from the plaintiffs' motion and reply memorandum any substantive arguments addressing the defendants' summary judgment contentions. The plaintiffs have been fully represented by counsel and have been afforded every opportunity to brief their position on all relevant issues. Nor is it the court's function or responsibility to fashion arguments and to find authorities opposing the defendants.

Most importantly, the defendants' contentions are not without substance or merit on their face. In their presentation of the implied good faith claims, the plaintiffs have not shown them to be derivative in nature, that is, conduct lacking in good faith and having a connection to an express contractual term. Instead, the plaintiffs have either alleged a duty without a connection to the contract or restated an express contractual duty without alleging any conduct that technically did not violate the duty but that denied them the intended fruit of the duty. The plaintiffs' reply memorandum suggests they are bringing this implied good faith and fair dealing claim based on an allegation that the defendants egregiously breached the loan agreement. The plaintiffs offer no legal authority to support such an implied covenant theory under Delaware or Kansas law. Consequently, the plaintiffs'

implied covenant claims are subject to summary judgment for adding

essential terms to the contract, for not showing how the defendants failed to

act reasonably in executing otherwise reasonable contractual terms, and for

not coming forward with facts to support a viable breach of the implied duty

of good faith and fair dealing under Delaware or Kansas law. On their face,

the defendants' arguments are sustained by the record and by the law, and

they warrant summary judgment on the implied good faith claims

particularly when the plaintiffs offer no well-stated legal or factual opposition

to them.

*2010 Refinance—Express and Implied Contract*

The defendants argue the plaintiffs lack any proof that Citibank

promised in the 2007 loan agreement to later refinance the loan. All

communications over the terms of the 2007 agreement merged into the final

written document which governs the parties' relationship. There are no

provisions in the note, mortgage, or related documentation evidencing this

express duty or justifying a derivative, implied duty to refinance. The

defendants also argue that any claim of an implied refinance promise based

on Citibank's agreement to guarantee their debt through the refinance would

still require the guarantee to be in writing under the Kansas Statute of

Frauds.

Again, the court cannot find any opposing response from

plaintiffs to any of these arguments in their memoranda. Nor can any

response be inferred from the plaintiffs' own summary judgment motion, because the plaintiffs did not seek such relief on their 2010 refinancing claim. In these circumstances, the court may conclude the plaintiffs have abandoned their implied contract claim based on the 2010 refinance. Moreover, the court finds that the plaintiffs have not met their summary judgment burden of showing a genuine issue of material fact over there being an implied duty of good faith for refinancing. The defendants are entitled to summary judgment on this claim.

*Other Contract Claims*

The defendants contend the plaintiffs' refinancing their loan with a different bank, U.S. Bank, "bars a claim for breach of express contract" under Delaware law. ECF# 524, p. 40. They ask the court to apply the "voluntary payment rule" here in that "money has been voluntarily paid with full knowledge of the facts, [and] it cannot be recovered on the ground that the payment was made under a misapprehension of the legal rights and obligations of the person paying." *Id.* (quoting *Nieves v. All Star Title, Inc.*, No. N10C-03-191 PLA, 2010 WL 2977966 (D. Del. July 12, 2010)(citations omitted)), *aff'd*, 21 A.3d 597 (Del. Supr. 2011). The defendants argue the plaintiffs were assisted by a mortgage broker and their current counsel before closing on the U.S. Bank loan and paying off the Citibank loan. Additionally, the plaintiffs had been provided a payoff quote which included the principal, interest, and charges on the loan, and they also had billing

invoices from which to assert any overcharges.  Alternatively, the

defendants argue the plaintiffs cannot show damages for the alleged breach

of contract. They take issue with the plaintiffs' allegation of damages in the

pretrial order as speculative estimates which do not meet the requirements

of Delaware or Kansas law and as calculations not properly supported by

expert witness testimony.

Again, the plaintiffs' opposition to summary judgment (ECF#

557) fails to address any of these legal arguments. Thus, the court has

looked through the plaintiffs' other filings to learn their positions. In their

reply memorandum filed in support of their summary judgment motion

(ECF# 567), the plaintiffs address the voluntary payment rule denying that

their payments were voluntarily made with full knowledge of the fees and

interest overcharged, of the payments not credited, and of the penalties

wrongly assessed. Instead, they argue that their payments were compelled

for closing the new loan and that the overcharges, penalties, uncredited

payments were concealed from them.  The court agrees that, at the very

least, there are questions of material fact on the plaintiffs' knowledge about

some of the overcharges and uncredited payments as to preclude summary

judgment on the voluntary payment rule. The payoff quote sent to

HomeQuest Mortgage did not fully disclose the total overcharged fees,

interests and penalties that had been paid or would be paid. Nor can the

court conclude from the billing invoices and from the plaintiffs' use of a

mortgage broker and the involvement of Ms. Hoffman that, as a matter of law, the plaintiffs voluntarily paid the debts with full knowledge of all overcharges, uncredited payments, and improperly assessed penalties.

As to what has been alleged as provable damages for these breaches of contract, the plaintiffs describe pecuniary damages for breach of contract in the amount of $26,070.20. ECF# 519, p. 37. The defendants submit as an uncontroverted fact that the plaintiff's expert "testified that he did not prepare an amortization analysis to determine the specific amount of interest allegedly overcharged on plaintiffs' loan." ECF# 524, p. 19. The plaintiffs' expert report states, "The interest rate impact is nearly impossible to calculate without a series of assumptions because review of print screens indicate [sic] multiple rate changes which are not reflected in the same manner or with detail on other documents." ECF 531-6, pp. 3-4. In short, the plaintiff's expert saw evidence of more interest rate fluctuations which prevented him from accurately calculating the impact of excessive interest rate charges. That the plaintiff's expert may have estimated some of the pecuniary damage elements does not taint the rest of his calculations or the plaintiffs' other evidence on damages. While the defendants quote other parts of the plaintiffs' expert's deposition testimony on damages during the PWP payment period, they failed to carry their summary judgment burden of presenting this as a material fact with no genuine dispute.

The party claiming damages for breach of contract must show an injury or loss from the breach and "with reasonable certainty the amount of damages suffered as a result of the injury or breach." *Shultz v. Edwards*, 3 Kan. App. 2d 689, 690, 601 P.2d 9 (1979) (citing *Venable v. Import Volkswagen, Inc.*, 214 Kan. 43, 50, 519 P.2d 667 (1974)). In short, there must be a "reasonable evidentiary basis for computation which will enable the jury to arrive at an approximate estimate of damages." *Wolfe Elec., Inc. v. Duckworth*, 293 Kan. 375, 396-97, 266 P.3d 516, 530 (Kan. 2011) (citation omitted). Delaware law is similar. Expectation damages are the standard measure for breach of contract and are to be proven with reasonable certainty, but if the fact of damages has been proven then the amount of damages can be established without precise certainty. *Siga Technologies, Inc. v. ParmAthene, Inc.*, 132 A.3d 1108, 1130-31 (Del. 2015); See *Frontier Oil v. Holly Corp.*, 2005 WL 1039027, at *39 (Del. Ch. Apr. 29, 2005), *judgment entered sub nom. Frontier Oil Corp. v. Holly Corp.*, 2005 WL 5794558 (Del. Ch. 2005) ("A prevailing party must prove its damages by preponderance of the evidence; absolute precision is not required but the proof may not be speculative either."). Based on the record presented and the arguments advanced, the court cannot say as a matter of law at this time that the plaintiffs are unable to show they were injured and to show with reasonable certainty the damages sustained as a result of the

defendants' alleged breaches in overcharging interest rates and fees, in not crediting payments, and in assessing penalties.

*Punitive Damages*

The plaintiffs' remaining claims are for breach of express contract (2007 loan agreement) involving fees, overcharges and penalties improperly assessed, interest rate charges exceeding the fixed loan rate, loan payments not applied or applied late, and other errors in servicing and calculating loan payments. The defendants addressed one or more of these claims individually under their KCPA analysis, but they did not address them individually under the breach of express contract theory. The defendants, however, do seek partial summary judgment on the plaintiffs' recovering punitive damages on these claims. The defendants look to Kansas law in arguing that punitive damages are not recoverable as contract damages

Whether Delaware or Kansas law, the governing proposition is the same that, punitive damages are not recoverable for breach of contract absent conduct that is independently a tort. *See, e.g., E.I. DuPont de Nemours and Co. v. Pressman*, 679 A.2d 436, 445 (Del. 1996); *Guarantee Abstract & Title Co. v. Interstate Fire and Cas. Co. Inc.*, 232 Kan. 76, 78, 652 P.2d 665 (1982). In *Guarantee,* the Kansas Supreme Court said:

> Damages for breach of contract are limited to pecuniary losses sustained and exemplary or punitive damages are not recoverable in the absence of an independent tort. *Temmen v. Kent-Brown Chev. Co.*, 227 Kan. 45, 605 P.2d 95 (1980). This exception to the rule of unavailability of punitive damages in breach of contract actions is recognized when some independent tort or wrong results in additional

33

injury which justifies the assessment of punitive damages by way of punishment of the wrongdoer. In such a case the proof of the independent tort must indicate the presence of malice, fraud or wanton disregard for the rights of others. The difference between a tort and contract action is that a breach of contract is a failure of performance of a duty arising under or imposed by agreement; whereas, a tort is a violation of a duty imposed by law. *Atkinson v. Orkin Exterminating Co.*, 230 Kan. 277, 634 P.2d 1071, *adopting* 5 Kan.App.2d 739, 625 P.2d 505 (1981).

*Guarantee Abstract & Title Co., Inc. v. Interstate Fire and Cas. Co., Inc.*, 232 Kan. at 78-79. Simply put, to recover punitive damages in a breach of contract action, "there must be an independent tort resulting in additional injury." 232 Kan. at 79. If all injury to the claimant flows "directly from the breach of the contractual duty," then there is "no independent tort upon which any punitive damages could be predicated." *Id*. Thus, "[b]reach of contract, standing alone, does not call for punitive damages even if the breach is intentional and unjustified, but such damages are allowable if there is some independent tort present." *Farrell v. General Motors Corp.*, 249 Kan. 231, 247, 825 P.2d 538 (1991). In sum, punitive damages in contract actions are permitted "when (1) there is some independent tort amounting to fraud or wanton conduct, and (2) the independent tort results in additional injury." *Osgood v. State Farm Mut. Auto. Ins. Co.*, 848 F.2d 141, 144 (10th Cir. 1988) (citing *Guarantee Abstract*, 232 Kan. at 78).

The court earlier dismissed the plaintiffs' two tort claims. ECF# 20, pp. 14-18. The defendants deny that the plaintiffs have alleged and shown tortious (fraudulent and wanton) conduct independent of contractual

duties and injuries beyond contractual damages for their claims involving the servicing of the 2007 loan agreement. The plaintiffs respond that they have briefed this issue in their own motion for summary judgment. ECF# 557, p. 47. The plaintiffs argue that the defendants' breaches of the 2007 loan involved a "willful disregard" of the plaintiffs' rights. The defendants deliberately posted payments late to earn more interest and to assess late charges. The defendants raised interest rates and skimmed fees after sending out mortgage statements to avoid detection. The defendants contracted for a bi-weekly payment program when they lacked the software to service loans in this way. The plaintiffs assert the defendants' conduct is tortious for not disclosing the software's inability which amounts to "intentional misrepresentation by omission, negligent servicing and/or training for example." ECF# 531, p. 32. Addressing the additional injury requirement found in *Guarantee Abstract*, the plaintiffs also contend:

> Certainly the conduct in the underlying breach of contracts rises to a tort. No doubt too, the Schneiders had additional injury not just apparent by the emotional distress of Randy and Amy unmistakably apparent in the deposition photograph, but also because they continue to pay U.S. Bank interest on the money from the overcharges required to be paid off as part of the overreaching inaccurate payoff to clear the Citi lien from their home and they borrowed money to help pay expenses to get the money back since Citi never provided a refund.

ECF# 531, p. 33 (footnotes omitted).

The court concludes the plaintiffs have not carried their summary judgment burden of presenting specific facts showing a genuine issue of material fact on whether defendants engaged in independent

tortious conduct, that is, actions violating a duty imposed by law and amounting to fraudulent or wanton conduct. Acting in willful disregard of the plaintiffs' contractual rights is not tortious conduct. Nor can the court find fraudulent conduct in the allegation that the defendants failed to disclose inabilities in its software. There is no evidence of affirmative misrepresentations about the software or about the use of manual transaction adjustments. In the end, the plaintiffs have only raised a question of material fact over the defendants' failure to service the loan as promised in the loan agreement and accompanying payment programs. Nor has the plaintiff come forward with specific facts showing a genuine issue of material fact that they suffered any additional injury resulting from the tortious conduct and not the contractual breaches. The defendants are entitled to summary judgment on the plaintiffs' remaining punitive damages claim.

**MOTION FOR SUMMARY JUDGMENT BY DEFENDANT CITIGROUP, INC. ECF# 526**

As the court's electronic docket sheet reflects, Citigroup's filing of its sealed motion for summary judgment and attached memorandum at ECF# 525 is a duplicate of its motion (ECF# 526) and memorandum (ECF# #527). The court shall disregard Citigroup's filing at ECF# 525.

Early in this litigation, Citigroup sought summary judgment before discovery was completed and argued that it was no more than a parent corporation and not a signatory party to any of the agreements in

question. The court denied the Citigroup's motion at that time because of ongoing discovery, because there was the legal potential for Citigroup's liability as a parent corporation, (ECF# 147, p. 2), and because when read liberally, "the [plaintiffs'] counsel's affidavit is sufficient to show a plausible basis for her belief that outstanding discovery may lead to evidence sufficient to raise a genuine issue whether either of these companies [Citigroup or Primerica] is liable for the acts alleged in the complaint," i*d*. at p. 4. The court concluded its ruling with, "[i]n the exercise of its discretion, the Court finds the motion for summary judgment to be premature so permits the Plaintiffs the opportunity to discover the **unusual** facts necessary to hold these Defendants liable." *Id.* at p. 5 (bolding added). Now that discovery is complete, (ECF# 519, p. 38), Citigroup seeks summary judgment again arguing it was not a party to any of the transactions and the plaintiffs remain without admissible evidence to carry their burden for avoiding summary judgment. The court agrees.

In deciding this motion, the court relies not only on the uncontested above factual background but on the following as uncontroverted in the summary judgment filings. Citigroup is a publicly traded corporation and operates as a holding company for other entities or affiliates, such as Citibank, N.A. f/k/a Citicorp Trust Bank ("Citibank") and CitiMortgage. Citigroup's corporate purpose is to provide consistent financial reporting for its shareholders. Thus, Citigroup receives business and financial

information from its entities for financial filings. Citigroup's business operations do not directly include the issuing or servicing of mortgage loans.

The plaintiffs do not effectively controvert these facts. And, the plaintiffs do not come forward with admissible evidence presenting a sufficient disagreement over Citigroup's liability as to require submission to the jury. The plaintiffs strain to infer facts from federal regulations and newspaper articles, and they also speculate over Citigroup's operations based on discovery conduct and ambiguous evidence. Looking "through the prism of the [plaintiffs'] substantive evidentiary burden," *Anderson,* 477 U.S. at 254, the court is confident that the plaintiffs asserted factual disputes are neither material, as in potentially affecting the outcome of the suit, nor genuine, as in being more than a scintilla of evidence.

The plaintiffs quote from a federal regulation that obligates a bank holding company to "serve as a source of financial and managerial strength to its subsidiary banks." 12 C.F.R. 225.4. From this sentence, the plaintiffs contend that Citigroup serves as "the manager, the conductor of this complicated network of businesses . . . and is obviously in control and responsible for the subsidiaries (sic) compliance with the law." ECF# 552, p. 15. This regulation is not evidence of how Citigroup operates, and the court does not read this language as any regulatory effort or attempt to establish corporate liability upon all holding banks for their subsidiaries' daily operations in making and servicing mortgage loans. "[S]erve as a source of

financial and managerial strength" is language better characterized as speaking to a policy purpose rather than a liability purpose. *Id.* The plaintiffs cite no case law or authority for reading this federal regulation in any different way. The defendants offer this unpublished decision by the North Carolina Court of Appeals:

> In support of that argument, Plaintiffs rely on the "source of strength" doctrine, which they describe as a policy adopted by the Federal Reserve Board ("FRB") to allow plaintiff parties to disregard limited liability and pierce the corporate veil. Citing *Anderson v. Abbott* for the principle that "federal laws and regulations are not disturbed by state corporate laws," Plaintiffs argue that our State's principles of corporate limited liability are not applicable because BOA is a bank holding company subject to the FRB's source of strength regulation. *See* 321 U.S. 349, 88 L.Ed. 793, *rehearing denied*, 321 U.S. 804, 88 L.Ed. 1090 (1944). We are unpersuaded.
>
> The source of strength doctrine is a federal regulation that requires bank holding companies to stand in as a "source of financial ... strength" for their subsidiaries. 12 C.F.R. § 225.4(a)(1) (2011). The FRB has stated that this doctrine is meant to incentivize bank holding companies to "act as sources of strength to their subsidiary banks [when threatened with failure] by standing ready to use available resources to provide adequate capital funds to subsidiary banks during periods of financial stress or adversity." Policy Statement on the Responsibility of Bank Holding Companies to Act as Sources of Strength to Their Subsidiary Banks, 52 Fed.Reg. 15,707 (30 April 1987).
>
> This regulation does not save Plaintiffs' unfair and deceptive trade practices claim. It is a federal mechanism employed by the FRB to regulate practices internal to the banking industry; it is not meant to—and does not—act as a substitute for or complement to our State's well-established jurisprudence on piercing the corporate veil. *See generally Bd. of Governors of the Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 35, 116 L.Ed.2d 358, 394 (1991) ("In October 1988, the [FRB] commenced an administrative proceeding against MCorp, alleging that MCorp violated the source of strength regulation and engaged in unsafe and unsound banking practices that jeopardized the financial condition of its subsidiary banks."). Plaintiffs have provided no other argument that the veil should be pierced. As a result, Defendant contends that we are bound by *Franklin v. Winn*

*Dixie, Inc.*, 117 N.C.App. 28, 450 S.E.2d 24 (1994), *aff'd per curiam*, 342 N.C. 404, 464 S.E.2d 46 (1995). We agree.

*Salmony v. Bank of Am. Corp.*, 748 S.E.2d 776, 2013 WL 3770688 at *4-*5 (N.C. App. 2013) (footnotes omitted), *rev. denied*, 367 N.C. 326 (N.C. 2014). The court agrees too.

Under Kansas law, "in the absence of fraud or other invidious and vitiating circumstances, the fact that one corporation is instrumental in the formation of another corporation and owns nearly all of the stock of the latter corporation does not have the legal effect of making the parent corporation liable for the debts of the subsidiary corporation." *Doughty v. CSX Transp., Inc.*, 258 Kan. 493, 497, 905 P.2d 106, 110 (Kan. 1995) (citing *Dean Operations, Inc. v. One Seventy Assocs.*, 257 Kan. 676, 680, 896 P.2d 1012 (1995)). The Kansas Supreme Court also explained:

> The *Dean* court noted that the fiction of separate corporate identities of two corporations will not be extended to permit one of the corporations to evade its just obligations; to promote fraud, illegality, or injustice; or to defend crime. Under circumstances where the separate corporate entity is disregarded, the parent corporation may be held liable for the acts of the subsidiary. The mere fact, however, that a subsidiary corporation was organized for the avowed purpose of avoiding liability on the part of the holding company does not in itself constitute fraud justifying disregard of the corporate entity of the subsidiary. The courts will disregard the fiction of a separate legal entity when there is such domination of finances, policy, and practices that the controlled corporation has no separate mind, will, or existence of its own and is but a business conduit for its principal. 257 Kan. at 681, 896 P.2d 1012.

258 Kan. at 497. The Kansas Supreme Court in *Doughty* noted that while alter-ego may be "a well-established doctrine in Kansas law" examples of

the doctrine being applied "in a parent-subsidiary corporate context are rare." *Id.* at 499-500. The Court concluded:

> The ultimate test for imposing alter ego status is whether, from all of the facts and circumstances, it is apparent that the relationship between the parent and subsidiary is so intimate, the parent's control over the subsidiary is so dominating, and the business and assets of the two are so mingled that recognition of the subsidiary as a distinct entity would result in an injustice to third parties. In addition to the factors used to determine a corporate alter ego status, a plaintiff must show that allowing the legal fiction of a separate corporate structure would result in injustice toward the plaintiff. Dean Operations, 257 Kan. 676, Syl. ¶¶ 5, 6, 896 P.2d 1012.

*Doughty v. CSX Transp., Inc.*, 258 Kan. at 500. Other than summarizing the different kinds of proof for imposing liability on a parent corporation, the plaintiffs make no attempt to apply the doctrine to the facts here and rely on speculation and innuendo.

For example, the plaintiffs point to a contract between Primerica and Citigroup and then presume that there must be other contracts between Citigroup and Citibank and/or CitiMortgage which Citigroup has failed to disclose in discovery. "Baseless speculation offered in opposition to summary judgment is not somehow excused by yet more speculation that discovery might uncover evidence that could be used to oppose summary judgment—'a plaintiff cannot defeat a motion for summary judgment by … amplifying [his conclusory allegations] with speculation about what discovery might uncover,' *Bryant v. O'Connor*, 848 F.2d 1064, 1067 (10th Cir.1988)." *Wishneski v. Andrade*, 572 Fed. Appx. 563, 569, (10th Cir. 2014) (unpub.). Because the purpose of summary judgment is to determine the necessity for

trial, "the nonmoving party must, at a minimum, direct the court to *facts which establish a genuine issue for trial*" and "may not rely on unsupported allegations." *White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). The nonmovant "'cannot defeat summary judgment and obtain discovery with just bald assertions and speculation of wrongful conduct.'" *Latham v. Board of Educ. of Albuquerque Public Schools*, 2012 WL 2855781, at *3, 489 Fed. Appx. 239, 243 (10th Cir. 2012)(unpub.) (quoting *T & M Distrib., Inc. v. United States*, 185 F.3d 1279, 1285 (Fed. Cir. 1999). Thus, the plaintiffs' arguments over the defendants' discovery conduct will not suffice for avoiding summary judgment.

The plaintiffs' exhibit 67 is a 2010 contractual agreement entitled a "Transition Services Agreement" between Primerica and Citigroup made "in contemplation of Primerica ceasing to be so wholly owned by Citigroup" that the parties wanted to "set forth certain agreements" on "certain matters." ECF# 553-6, p. 2. Based on this, the plaintiffs contend Citigroup's operations include more than financial reporting and must be providing other services to the subsidiaries which will now be for a fee after the transition. This argument is still nothing more than speculation. In addition, the court sustains the defendants' objection to the plaintiffs' failure to authenticate this exhibit for admissibility. The Tenth Circuit does "not require an affidavit to authenticate every document submitted for consideration at summary judgment," *Law Co. v. Mohawk Constr. & Supply Co.*, 577 F.3d 1164, 1170

(10th Cir. 2009), because under Federal Rule of Evidence 901, evidence satisfying the authentication requirement can include "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." Fed. R. Evid. 901(b)(4). The plaintiffs here do not aver or disclose the source of this exhibit. There is an internet address at the bottom of the pages, but the plaintiffs' summary judgment filing (ECF# 552) does not argue for authentication on that ground. Finally, the contract lacks a signatory page making it incomplete. Besides proving nothing about Citigroup's control over its subsidiaries, this exhibit has not been shown to be admissible evidence.

While the defendants' Bate stamp on exhibit 66 suffices for authentication, this evidence does not move the plaintiffs' burden forward in proving parent liability. A loan brokerage agreement between Citicorp Trust Bank and CitiMortage does not evidence Citigroup's control over its subsidiaries. Exhibits 84 and 85 are isolated pages taken from orders by the Board of Governors of the Federal Reserve System. Exhibit 84 appears to be first page of a penalty assessment order. ECF# 556-7. Exhibit 85 is a consent order. ECF# 556-8. While these appear to be the first pages of regulatory orders, they are not complete, lack signatory pages, and bear no markings of officially filed orders. The court will not assume the burden of authenticating these orders. The plaintiffs' counsel deposed Citicorp's Fed. R. Civ. P. 30(b)(6) corporative representative witness, and asked about these

orders. The witness answered that these orders represented legal positions taken in certain legal contexts and that his opinion about Citigroup not controlling subsidiaries' operations was not changed by these orders. Because the findings in these orders are ambiguous and lack a factual and legal context for construing them, the court will not accept them as admissible evidence, and even assuming they were, they are not significantly probative as to create a genuine issue of material fact for parent corporation liability. The plaintiffs also argue that Citigroup's control based on its securitization of mortgage loans for investment purposes. The plaintiffs offer no direct evidence of their loan ever being securitized. The admissibility of the plaintiffs' evidence that Citigroup securitized loans is questionable at best, and more importantly, it fails to provide a legal and factual context for Citigroup's liability as a parent holding company. In sum, the plaintiffs have not carried their Rule 56 burden of showing Citigroup's liability for the breach of contract claims. Alternatively, the court also finds that Citigroup did not engage in a "consumer transaction" with the plaintiffs under the KCPA and does not meet the KCPA's definition of supplier, because neither Citibank nor CitiMortgage qualify as suppliers for the reasons already discussed above. Citigroup's motion for summary judgment on all claims is granted.

## MOTION FOR SUMMARY JUDGMENT BY DEFENDANT PRIMERICA FINANCIAL SERVICES HOME MORTGAGES, INC. ECF# 528

Primerica opens by quoting the court's prior order that if the plaintiffs do not discover and present as evidence "the unusual facts necessary to hold" this defendant liable, then the court would "not hesitate to grant a similar summary judgment motion after the close of discovery." ECF# 147, p. 5. Primerica argues that after extended and extensive discovery what the plaintiffs have "developed only confirm[s] that Primerica had no involvement in any of the events giving rise to the liability claims here." ECF# 529, p. 1.

In deciding this motion, the court looks to the background facts set out above and to the following facts as uncontroverted. The plaintiffs' efforts in their filed memoranda have not effectively controverted the following statements as presented and supported by the defendant Primerica's memoranda.

Primerica did not service the plaintiffs' 2007 loan with Citicorp and did not maintain any business records generated in the servicing of the plaintiffs' loan with Citicorp. But, the 2007 loan did come about after the plaintiffs contacted and interacted with Kerry Cobb, an independent contractor and representative of defendant Primerica. While called a loan originator, Ms. Cobb principally worked with clients in completing the initial loan application. She served as a document conduit, that is, facilitating and gathering the documents for their use in Citibank's evaluation and

processing. In her role, Ms. Cobb said she would explain what the initial documents were to do and were for, but she was not the lender and did not select the loan options. She presented the customers with only the loan options developed by Citibank. Primerica did not represent itself as responsible for the loan options and did not act as the party approving the loan application. Ms. Cobb's role did not extend to closing the loan transaction or to explaining the transactional products and programs at closing. The plaintiff Randall Schneider avers that he and his wife trusted and relied on Ms. Cobb to explain all Citibank products and programs before they went to closing and that Ms. Cobb "was the only one who ever explained our loan features." Mr. Schneider also denies that the Citibank representative explained any of the documents in closing on the 2007 loan.

In May 2010, the plaintiffs again went to Ms. Cobb for refinancing with Citibank, and she worked with them in preparing the application. As part of this process, on May 3, 2010, the plaintiffs signed a document with Primerica called a Mortgage Broker Agreement and Disclosure which contains several terms material to the plaintiffs' claims. First, Primerica does not "make loans, guarantee acceptance into any particular loan program, or promise any specific loan terms or conditions." ECF# 529-13, p. 1. Second, Primerica assists "in completing documents and disclosures, . . . submitted to the Lender" and provides other services that include "explaining the available loan products and processes associated with

it; documenting your information for the information kit worksheet, educating you in the home financing process, including advising you about the available loan products and how costs and payments may vary under different proposals . . . ." *Id.* at p. 1. Third, the client agrees to engage the Primerica representative to provide these services but with the understanding that the representative "is acting as an independent broker on behalf of PFSHMI and the Lender, and not as your agent, broker, or representative." *Id.* Fourth, the client would not pay a fee or compensation to Primerica. *Id.*

Ms. Cobb's met with the Schneiders to identify and gather the necessary information for the worksheet about their financial status and their desired terms for a refinance. Amy Schneider testified that she and her husband signed this worksheet but that Ms. Cobb completed it with the required information. The worksheet and information were then submitted to Citibank which prepared a loan application from those submissions and mailed the application to the plaintiffs for their review and approval. On May 20, 2010, the Schneiders signed this loan application and submitted it to Citibank. This application required, in part, the Schneiders' assessment of the property's valuation, and the application stated the property was valued at $130,000. This 2010 valuation exceeded the property's appraised value for the 2007 loan by $10,000. As part of the normal mortgage loan review, an appraisal of the Schneiders' property was ordered, and this appraisal on

May 24, 2010, reported the property was worth only $85,000. Because of the lower appraised value, Citibank representatives informed the Schneiders that they were not qualified for the loan for which they applied. It is controverted whether Citibank proposed alternative mortgage loan terms to the Schneiders and whether Ms. Cobb was responsible for not communicating any such terms. It is uncontroverted, however, that Amy Schneider shortly thereafter informed Ms. Cobb that the Schneiders would obtain their financing through a different lending institution.

*KCPA Claims*

Primerica contends the plaintiffs cannot prove it functioned as a "supplier" engaged in the "consumer transactions" under the KCPA for its limited roles in the 2007 loan and the refinancing application of 2010. As to the plaintiffs' KCPA claims that arise out of the servicing of the 2007 loan, there is no evidence that Primerica issued or serviced this loan either on its own or as an agent of Citibank. As for the KCPA claims involving the 2010 refinancing application, there is no evidence that plaintiffs applied to Primerica, that Primerica decided the application, or that Primerica played a part in deciding the plaintiffs' eligibility for the loan or for any loan options. In short, the plaintiffs' KCPA claims, as alleged, do not turn on consumer transactions with Primerica. The plaintiffs refer generally to the Mortgage Broker Agreement with Primerica, but this Agreement confirms that Primerica did not make loans, did not guarantee the plaintiffs' acceptance

into a loan program, and did not promise specific loan terms. Instead, the Agreement spells out that Primerica only was to assist with completing documents and disclosures for submission to the Lender, with explaining available loan products and processes, with documenting information for the worksheet, and with advising about the costs and payments associated with the proposed loan products. The Agreement also discloses that Primerica would provide these services not as the plaintiffs' agent, broker or representative. In sum, the terms of this Agreement do not establish an actionable consumer transaction covered by the plaintiffs' claims as alleged. In short, Primerica contends the plaintiffs are unable to prove it was a supplier in the consumer transaction for which they bring claims for deceptive or unconscionable acts involved with the servicing and enforcing the 2007 loan and with their applying for refinancing in 2010.

The plaintiffs respond with several points, but none amount to an actionable KCPA claim here. First, that granting a home loan is a consumer transaction, but the plaintiffs offer no evidence of Primerica granting a home loan here. Second, that Primerica contracted under the Mortgage Broker Agreement, but the plaintiffs offer no evidence of a KCPA violation specifically arising out of the contractual responsibilities in that agreement. Third, that marketing loans is a consumer transaction, but the plaintiffs offer no evidence of Primerica's conduct being the factual and legal conduct responsible for any of KCPA violation. They refer to a Loan

Brokerage Agreement amended in March of 2010 between Primerica, Citibank and CitiMortgage. Neither is it clear nor have the plaintiffs explained how this agreement tends to prove Primerica engaged in any consumer transaction within the scope of what the plaintiffs allege as their claims. Fourth, that Primerica served as a loan originator and was involved with "continued representation of the Payment Waiver Protection Program." ECF# 559, p. 19. But, the plaintiffs do not assert how Primerica in its role as loan originator makes it factually and legally liable for the mortgage's company's application and execution of the Payment Waiver Program. Moreover, the plaintiffs offer no evidence from which to infer Primerica's "continued representation" or involvement in this program or from which to assert Primerica's liability for the mortgage company's conduct. There is no evidence of record indicating that Primerica had assumed any continuing and ongoing duties under this program. Nor have the plaintiffs come forward with facts sustaining any reasonable inference of the same. That Ms. Cobb later assisted in cancelling their enrollment in the program is not evidence of Primerica becoming liable for the mortgage company's administration of the program. Instead, the plaintiffs have admitted that Ms. Cobb had been serving as their ongoing financial advisor. (Pretrial Order, ECF# 519, p. 18).

As set out in the pretrial order, the plaintiffs' contentions against Primerica are vague. As to the 2007 loan, the court finds no specific allegations against Primerica's conduct in the "Contentions of the Plaintiffs"

section of the Pretrial Order. As to the 2010 refinancing application, the plaintiffs factually contend that they applied for refinancing through Primerica and despite being well qualified they were turned down by Citibank. Specifically, they allege that "Primerica . . . concealed the eligibility and did not provide the 'Citiquick' program or any other alternatives for which they were qualified." (Pretrial Order, ECF# 519, p. 12). They also contend that unknown to them, "Primerica had gone public in this time and was not a wholly owned subsidiary of Citigroup." *Id.* In sum, the plaintiffs contend that Primerica in the 2010 refinancing application "concealed" the plaintiffs' eligibility and failed to provide other programs and alternatives for which they were qualified.

The plaintiffs' legal claims against Primerica in the pretrial order are no clearer. They assert a "contract with Primerica, as an agent for Defendants sold the PWP waiver program and continued to be the Schneiders' reference and advisor to stop the PWP going so far as to fax the cancellation from Primerica's officer after the plan benefits were exhausted." *Id.* at p. 18. The plaintiffs, however, concede they have no other claim against Primerica for servicing the 2007 loan: "As to Primerica, except for the PWP contract and handling of the PWP, the Plaintiffs do not claim Primerica is responsible to other servicing overcharges of Citi defendants." *Id.* at p. 19. As for the 2010 refinancing, the plaintiffs' claims include the following disconnected allegations:

Primerica was also in contract with the Schneiders by the execution of the Mortgage Broker Agreement and Disclosure which notably indicates the exclusive relationship with Citi defendants. Responsibility of the Defendants is layered and intertwined, however Primerica was responsible for Kerry Cobb and to the Schneiders as registered under the Kansas Mortgage Business Act, *See* K.S.A. 9-2201 *et seq.*

Primerica, as a licensee, had affirmative obligations to assure its employees' compliance with the law (K.S.A. 9-2203). . . .

Notably, Primerica engages in a Mortgage Broker Agreement then in the same document advises they (sic) are not a broker. . . . To the extent Defendants seek a defense as to no requirement to attempt to get a loan, provide the options, process, or take best efforts the Schneiders would look to the conduct in the Kansas Mortgage Business Act, for which an applicable disclosure was provided by Kerry Cobb for Primerica, essentially an arm for Citi Defendants. During the pendency of this case, Primerica has seemed to claim to this Court they were a wholly owned subsidiary yet it appears that at the 2010 loan refinance attempt they had already been sold but maintained a contractual relationship with Cirigroup (sic) to provide software and support among other things (December 2016 first disclosed and produced).

ECF# 519, at pp. 18-19. From these allegations, the court cannot discern any viable legal grounds for Primerica's liability for the Citibank's servicing of the 2007 loan or for Citibank's handling of the 2010 refinancing application.

In their summary judgment memorandum, the plaintiffs attempt to draw out three claims from these vague allegations. First, that Primerica knew and failed to disclose that CitiMortgage was the lender and not Citibank to whom they applied for refinancing in 2010. The plaintiffs' evidence on this claim fails to raise a genuine issue of material fact as to whether Citibank was the lender and corporate entity which took legal responsibility for accepting and not granting their 2010 refinancing loan application. The involvement and support of CitiMortgage personnel in

processing the application does not misrepresent who is taking legal responsibility for the decision. Furthermore, the plaintiffs' evidence also fails to show this to be a material fact, which if not disclosed, would be a violation of the KCPA or the Kansas Mortgage Business Act or would be a breach of contract or implied duty of good faith. Second, that Primerica concealed its own sale just before the refinancing application. Again, the plaintiffs' evidence does not show any material misrepresentation or omission or breach based on this event and its alleged timing. Finally, that Primerica concealed Citibank's alternative loan proposal to them as constituting the "concealing" of the plaintiffs' eligibility. The plaintiffs have no evidence of Ms. Cobb concealing the plaintiffs' eligibility. At most, there is evidence that besides not accepting the plaintiffs' application, Citibank asked Primerica to take the plaintiffs an additional proposal for a smaller loan with cash payment, but the plaintiffs, in the meantime, sought full refinancing of their loan from another institution and subsequently informed Ms. Cobb of the same. Assuming for the sake of argument that Ms. Cobb failed to communicate this proposal, this is hardly a concealment of any material fact as to violate the KCPA or to constitute a breach of contract. The plaintiffs certainly should have known and appreciated that they could always apply to refinance for a smaller loan more in keeping with the property's appraised value and to use whatever cash they had available to cover the difference. Instead of pursuing what Ms. Cobb described as an ongoing process, the

plaintiffs went elsewhere and refinanced for the full amount. The court finds no plausible question of material fact as to preclude summary judgment on this allegation.

Finally, the court agrees that the plaintiffs have not come forward with any evidence to show how they were harmed by Primerica's alleged breaches of contract. The discovery is closed, and the plaintiffs' speculations and allegations will not prevent summary judgment.

As fully discussed above, the plaintiffs' evidence in support of their KCPA and breach of contract claims against Primerica is not significantly probative. Besides lacking the necessary evidence to sustain them, the plaintiffs' legal theories are lacking in substance and specifics. Primerica is entitled to summary judgment on all the plaintiffs' claims.

**MOTION FOR PARTIAL SUMMARY JUDGMENT BY PLAINTIFFS RANDLL A. SCHNEIDER AND AMY L. SCHNEIDER. ECF# 530**

In the motions already decided herein, the court has granted the defendants' motions for summary judgment but for the plaintiffs' claims against the defendants Citibank and CitiMortage for breach of the express terms of the 2007 loan agreement. The court denied the defendants' summary judgment arguments based on the voluntary payment rule which necessarily means the plaintiffs cannot prevail on their dispositive motion because of this defense.  To assist the resolution of this case, the court finds the following facts should be regarded as uncontroverted:

1. The plaintiffs refinanced their residential mortgage loan with Citibank on September 17, 2007, for $107,996.88 for a term of 10 years with a fixed interest rate of 7.96544%. CitiMortgage has admitted that the plaintiffs' monthly mortgage statements dated June 23, 2010, and July 27, 2010, reflect an interest rate of 8.2154% on the plaintiffs' loan, and this was in error.

2. Citibank's representative, Ms. Dauster-Adams, testified in the Rule 30(b)(6) deposition that from her review of the "data notes" regarding the plaintiffs' loan she found that the plaintiffs were put back on the equity builder program after the PWP payments ended, but that they did not then receive the benefit of the interest rate reduction under the program from March 23, 2010, through June 14, 2010. ECF# 532-11, p. 2.

3. The defendants object to the plaintiffs' statements of fact (S-45 through S-48) addressing the automatic loan payments taken from their bank account from November 13, 2007, through August 18, 2008. The defendants object to plaintiffs' exhibit 6, ECF# 531-7, arguing authenticity, failure to produce in discovery, failure to identify witness in discovery, failure to establish witness' s competency, and its contradiction of the parties' stipulation. The court overrules these objections as the plaintiffs have submitted an affidavit by this same witness dated February 25, 2015, as custodian of business records, which apparently accompanied the bank's production of its records to the defendants. ECF# 568-11. As for the parties'

stipulation that the plaintiffs' responsibility to make mortgage payments was "ultimately addressed" by the PWP, the terms of this stipulation do not necessarily preclude proof that the defendants also made automatic withdrawals from the plaintiffs' account during this same period. Consequently, the plaintiffs' statements of fact appearing at S-45 through S-48 are uncontroverted. ECF# 531.

4. The defendants do not effectively controvert the plaintiffs' citation and quotation of what appears on the face of CitiMortgage's statements issued to the plaintiffs and appearing at ECF# 531-9. The defendants' objections to authenticity are denied, as these pages bear not only the characteristics of what they purport to be, but they also include the defendants' Bates stamp. Thus, the plaintiffs' facts appearing at S-48 through S-53 are uncontroverted.

5. The plaintiffs participated in the $.M.A.R.T. Completion Plan expecting to build up their home equity more quickly by including an extra $89.86 direct principal reduction payment in the scheduled automatic withdrawal payments from November 13, 2007, through August 18, 2008.

6. The plaintiffs received reimbursement checks from CitiMortgage in the amounts of $1,434.73 on September 24, 2008, and $2,368.35 on October 3, 2008. The amount of $1,434.73 equals a monthly note payment ($1,308.33) plus a PWP payment ($126.40). The amount of $2,368.35 is $501.11 less than $2,869.46 ($1,434.73 x 2).

7. Payments on the Schneiders' loan were made on June 1 and 14, 2010, but these payments were not credited until June 15, 2010, and were treated as one payment.

8. CitiMortgage sent plaintiffs a letter dated July 8, 2010, stating their mortgage payment was overdue in the amount of $656.38, including $65.41 in late fees. CitiMortgage's statement dated July 27, 2010, represented that the Schneiders were past due $2,869.46. CitiMortgage sent a letter dated July 29, 2010, stating the Schneiders' loan was in default with a past due amount of $1,964.71, including $65.41 in late charges.

9. In December of 2008 and January of 2009 while loan payments were the responsibility of the PWP program, CitMortgage drafted three automatic payments on December 29, January 11, and January 25 from the plaintiffs' bank account. CitiMortgage reversed these transactions on January 29 without any adjustment or credit for having taken and depriving the plaintiffs of these funds for that time.

10. When the two years of PWP's coverage of payments ended March of 2010, CitiMortgage automatically resumed auto draft payments under the Equity Builder Plan on April 19, May 3, May 17, June 1, and June 14 of 2010. The defendants' mortgage statement dated April 26, 2010, reflects the April 19 payment as received on April 20 and states that the plaintiffs have a past due amount of $1434.73 with a late charge of $65.41. The defendants' mortgage statement dated May 27, 2010, reflects the May 3 payment as

received on May 5 and the May 17 payment as received on May 18. This statement also reflects that on May 5 a late charge of $65.41 was assessed against the extra principal payment of $89.86 and that a completion plan fee of $126.40 was assessed against the principal credit applied from the regular loan payment of $717.36.

11. The completion plan fee assessed on May 5 was for the PWP program. Based on other summary judgment filings, it is uncontroverted that the Schneiders received correspondence from CitiMortgage back in July of 2008 stating that CitiAssurance Services had notified CitiMortgage "to cancel your optional Completion Plan. Your monthly mortgage payment has been adjusted to reflect this change. However, please note that any past due unpaid fees will be included in any Payoff Statement you request, and collected at the time your loan is paid in full." ECF## 557 and 557-15. When this completion plan fee appeared on May mortgage statement, Amy Schneider telephoned the defendants asking it to stop this plan fee. Ms. Cobb typed a letter of cancellation that was signed by Randall Schneider and faxed to Citi Assurance Services on May 14, 2010. From the defendants' motion for summary judgment, it is uncontroverted "that the loan was assessed the $126.40 Payment Waiver program fee in five or six invoices from March 2010 through the date plaintiffs refinanced the loan with an unrelated lender. . . . The total of the fees plaintiffs contend were improper ($126.40 x 6) is $768.40." ECF# 524, p.10, ¶ 34.

12. CitiMortgage's payoff statement dated June 17, 2010, included a prepayment penalty of $829.42 and a fax/statement fee of $25.00, and it specified an interest rate of 8.215%. The loan and other contract documents do not provide for a fax/statement fee. To clear the title, Schneiders paid CitiMortgage's required payoff including interest through August 13, 2010, for a total of $84,931.70. CitiMortgage received the payment on August 9, 2010. CitiMortgage sent a letter on August 10, 2010, indicating the payment was insufficient by $6.76 and asking for additional funds. Since the payoff, no defendant has provided any refund.

**DEFENDANTS' MOTION FOR REVIEW OF FINAL PRETRIAL ORDER ECF## 534 AND 536 and PLAINTIFFS' MOTION FOR SUMMARY DENIAL OF THESE MOTIONS ECF #578.**

The defendants filed twice what appears to be the same set of objections to the pretrial order. These filings lack a memorandum necessary in providing both a legal and factual basis for the defendants' objections. The filings presently offer only conclusory objections without supporting citations, legal authorities, and factual record. The defendants' objections are of the kind that require a supporting record and citations. These filings also refer to an exhibit which is not attached. Because the defendants' filings are entirely deficient without a supporting memorandum and attachment, the court summarily denies them pursuant to D. Kan. Rule 7.4(a). Besides this procedural ground, the court's summary judgment rulings effectively moot two of the defendants' objections, and the defendants' remaining

objection to the plaintiffs' damage calculations fails to show the magistrate judge's work to be clearly erroneous or contrary to law. Thus, the court denies both the defendants' motion for review and the plaintiffs' motion for summary denial.

**PLAINTIFFS' MOTION TO STRIKE ECF# 581 DEFENDANTS' NOTICE OF SUPPLEMENTAL AUTHORITY ECF# 575.**

This is the last filed motion still pending. The court denies this motion as moot because of the court's above summary judgment ruling.

IT IS THEREFORE ORDERED that the summary judgment motion of CitiMortgage and Citibank ECF (#523) is granted against the plaintiffs' KCPA claims, implied contract claim for 2007 loan, express and implied contract claims for 2010 refinancing, and punitive damage claims, and is granted in its request to enforce the contractual choice of law provision in the 2007 loan, but it is denied as to the 2007 express contract claims;

IT IS FURTHER ORDERED that the summary judgment motion of defendant Citigroup (ECF #526) is granted;

IT IS FURTHER ORDERED that the summary judgment motion of defendant Primerica (ECF# 528) is granted;

IT IS FURTHER ORDERED that the partial summary judgment motion of the plaintiffs (ECF# 530) is denied but the court regards certain factual statements to be uncontroverted;

IT IS FURTHER ORDERED that the defendants' motions for review of the final pretrial order (ECF## 534 and 536) and the plaintiffs' motion for summary for denial of these motions (ECF# 578) are denied;

IT IS FURTHER ORDERED that the plaintiffs' motion to strike the defendants' (ECF# 581) notice of supplemental authority (ECF# 581) is denied.

Dated this 19th day of September, 2018 at Topeka, Kansas.


s/Sam A. Crow
Sam A. Crow, U.S. District Senior Judge